JONES *v.* STATE.

Crim. 4089

Opinion delivered May 9, 1938.

*Edward Gordon,* for appellant.

*Jack Holt,* Attorney General, and *John P. Streepey,* for appellee.

DONHAM, J. Appellant was indicted by the grand jury of Conway county on a charge of murder in the first degree alleged to have been committed by his having shot and killed one Charles Pickthorne. He was tried, convicted and sentenced to a term of seven years in the state penitentiary, the conviction being for murder in the second degree.

On the morning of July 12, 1937, the deceased, Charles Pickthorne, was engaged with one Jim Carrey, his employee, in making preparation to whitewash a barn. He had gotten the ingredients with which to make the whitewash and at the time he was shot by appellant, he and Carrey were engaged in mixing these ingredients by pouring them into a barrel. Appellant came into the barn and spoke to Pickthorne and Pickthorne spoke to him. Someone else came into the barn, but walked out and was not present at the time the shooting occurred. Appellant walked up to within five feet of the place where deceased and his employee, Carrey, were working and

stood there a minute or two before he shot the deceased. Carrey testified that deceased was standing facing him with his left side to appellant, pouring salt into the barrel in which the mixture for the whitewash was being prepared. Carrey testified that he was stirring the mixture and was standing practically against the deceased when the first shot was fired. The deceased had a six-pound sack of salt in his hands, according to the evidence given by Carrey, and was pouring it into the barrel. There were two shots fired in rapid succession before deceased had time to move. Deceased, after being shot, ran around the barrel into which he was pouring the salt, climbed over a gate, crawled under another gate and went to a blacksmith shop. Carrey testified that when deceased climbed over the gate he fell; that appellant snapped his gun several times at deceased while he was on the ground; that the deceased then went on through a small lot, walked to the blacksmith shop and fell at the front door thereof; and that when he started to fall a man by the name of Isaacs caught him and laid him down on the ground. Carrey further testified that there was no warning before the shooting began; that he saw nothing in the deceased's hands except a sack of salt; that if he had had a knife in his hands he would have seen it; that the deceased did not reach over to pick up a can to throw at anyone; and that he did not stoop over at all. Carrey further testified that when appellant quit snapping his pistol he turned and walked out of the barn; and that later he saw appellant sitting in front of the barn.

Elmer Thomas testified that he was deputy sheriff on July 12, 1937, the date of the killing; that when he got to the barn where the shooting occurred, appellant was sitting on a bench in front of the barn; that he asked appellant what he knew about the shooting; and that appellant said he didn't know anything about it at all.

Dr. H. E. Mobley was called as a witness and testified that the deceased was brought to his hospital after the shooting on July 12, 1937; that one of the shots had gone through the flesh of the left arm, entered the body and

came out under the opposite arm; that a second shot entered the body just below where the first one had entered it, and that it came out on the opposite side; that either of the two shots was sufficient to cause death; that the two shots did cause the death of the deceased; that the deceased lived about four and a half hours after he arrived at the hospital, dying on the same day he was brought there; that he was still conscious when he reached the hospital, but was suffering from shock and loss of blood.

Many other witnesses testified; and it was shown that ill feeling had existed between the deceased and appellant for sometime prior to the time deceased was killed. It was shown that appellant was seventy-five years of age and in poor health; and that he had deeded all his property to his brother, the consideration for the transaction being the agreement of the brother to support and keep him the remainder of his life. The brother had died and Mrs. Brit Jones, his wife, had been appointed administratrix of his estate. Appellant, it was shown, thought that Pickthorne, son-in-law of his deceased brother, was disposing of the property and squandering same to such an extent that he, appellant, would be left without any means of support. He had protested to the wife of his deceased brother, who tried to convince him that Pickthorne, he being her son-in-law, was honest, and that he was guilty of no misconduct in handling the estate for which she had been appointed administratrix It is shown that Pickthorne had armed himself, and that on different occasions he was seen with a pistol; and that he had made remarks about killing appellant. From the evidence it is apparent that appellant, at times prior to the killing, had thought his life was in danger. On the day of the killing, appellant armed himself and went to the barn as hereinabove stated, walked into where deceased and his employee were engaged in mixing ingredients to make whitewash to use in whitewashing the barn, and, according to the evidence on behalf of the state, without any immediate provocation, shot the deceased. The deceased was not armed at the time of the killing.

In testing the legal sufficiency of the evidence to sustain a verdict of guilty, it has been many times held by this court that same must be viewed in the light most favorable to the state. *Slinkard* v. *State,* 193 Ark. 765, 103 S. W. 2d 50; *Smith* v. *State,* 194 Ark. 264, 106 S. W. 2d 1019; *Link* v. *State,* 191 Ark. 304, 86 S. W. 2d 15; *Clayton* v. *State,* 191 Ark. 1070, 89 S. W. 2d 732; *Walls & Mitchell* v. *State,* 194 Ark. 578, 109 S. W. 2d 143.

There is really no contention that the evidence is not sufficient to sustain the verdict of the jury. The contention made by appellant for reversal is that he should have been given a new trial on the ground of newly-discovered evidence. Attached to his motion for a new trial are three affidavits which he contends contain statements material to his defense; that he did not know of this newly-discovered evidence prior to the trial; and that same could not have been obtained by due diligence on his part.

The verdict of the jury was rendered on October 14, 1937. The motion for a new trial, to which these affidavits were attached, was sworn to and filed on October 14, 1937. All of the affidavits which appellant now contends contain information that he could not have obtained prior to the trial were dated October 14, 1937. Under the evidence before the trial court, the question of due diligence was one that addressed itself to the court's sound discretion. Without setting out the statements contained in these affidavits, it will suffice to say that they are merely cumulative to the testimony which the appellant introduced in his behalf at the trial. This court has held in many cases that a motion for a new trial for newly-discovered evidence is addressed to the sound discretion of the trial court; and that where the evidence is merely cumulative, it will not be held to be an abuse of discretion to refuse to grant it. *Ward* v. *State,* 85 Ark. 179, 107 S. W. 677; *Cravens* v. *State,* 95 Ark. 321, 128 S. W. 1037; *Crouthers* v. *State,* 154 Ark. 372, 242 S. W. 815; *Carter* v. *State,* 174 Ark. 871, 298 S. W. 7; *Brown* v. *State,* 143 Ark. 523, 222 S. W. 377; *Reeder*

v. *State,* 181 Ark. 813, 27 S. W. 2d 989; *Bourne* v. *State,* 192 Ark. 416, 91 S. W. 2d 1029.

No error appearing, the judgment is affirmed.