## MITCHELL v. STATE.

### Opinion delivered April 15, 1907.

1. EVIDENCE—MEMORANDUM OF DYING DECLARATION.—Where one who heard a dying declaration made a written memorandum thereof which he testifies is not a full statement of such declaration, but is correct as far as it goes, he may read the memorandum and supply from his recollection the remainder of the declaration. (Page 327.)

2.  SAME—RES GESTAE.—It was not error in a murder case to refuse to
    admit a self-serving statement of the defendant made after the killing
    as part of *res gestae* if it does not appear how long after the killing
    the statement was made.   (Page 328.)

Appeal from Lafayette Circuit Court; *George W. Hays,*
Judge; affirmed. .

*Searcy & Parks,* for appellant.

1.   It was error to admit the purported dying statement of
deceased.   Dying declarations are only admissible as to actual
facts which point distinctly to the cause of death.   16 Ala. 672;
56 L. R. A. 369; 132 Ind. 317; 31 N. E. 536. . Nothing
can be admitted as a dying declaration, no fact stated by de-
ceased is competent, unless it would be permitted if he
were a witness on the stand.   Cases *supra;* 102 Ala. .135.
The statement was not complete.   1 Gr. Ev. § 161b.

2.   It was error to refuse witnesses Glass, Booker and de-
fendant to testify as to what was said by defendant in explana-
tion of the shooting as part of the *res gestae.*   48 Ga. 607;
Whart. on Ev. § 259; 44 Mo. App. 513; 32 Minn. 394; 50 Am.
Rep. 583; 30 Tex. App. 619; 19 L. R. A. 19; 43 Ark. 103;
20 *Id.* 216; 12 *Id.* 782.

3.   The 4th instruction should have been given.   43 Ark.
104.

*William F. Kirby,* Attorney General, and *Daniel Taylor,*
Assistant, for appellee.

1.   No objection was interposed to the admission of the
dying declaration.   This writing was not signed by defendant,
nor does the proof show that it was read over to him and as-
sented to, but no objection was made.   10 Am. & Eng. Enc. Law
(2 Ed.), p. 391; 45 Iowa, 486; 24 Kans. 189; 40 Iowa, 555; 51
*Id.* 142; 99 Pa. 33; 92 Ala. 9; 79 *Id.* 5; 72 Pac. Rep. 627.
The only objection was to the oral testimony and not to the
writing.

2.   The testimony of Booker and Glass was no part of the
*res gestae;* nor were the statements of defendant.   72 Ala. 112;
66 Ark. 494; 69 *Id.* 558.

3.   There is no error in the instructions and the verdict
amply supports the verdict.

McCULLOCH, J. Appellant stands convicted of murder in the first degree for the killing of one Will Murphy. He admits the killing and seeks to justify it.

The State introduced the only eye-witness to the killing, who testified as follows:

"I was present and saw the defendant, Cornelius Mitchell, shoot the deceased, Will Murphy, with a shotgun. This occurred at dry kiln No. 4 on the night of December 23, 1906, in Lafayette County, Arkansas. Deceased came to where I was at work at this dry kiln about five minutes after 2 o'clock on the morning of the 24th. When I came in from punching the clock, I found Will Murphy standing by the furnace. He asked me if he could stay there until morning. I told him it was against the rules, but if the 'walker' did not object when he came around he might stay. He sat down in a chair and, after talking awhile, showed me a five-dollar bill, which I advised him to take home to his father, and he said he was going home that morning. He went to sleep sitting in the chair. I was also sitting in a chair with my face toward the wall, watching my clock. My back was to the furnace. I was watching my clock to punch it at 3:25, and it was not quite that time. The deceased was apparently asleep. My attention was first attracted by the creaking of a door. At first I was not surprised, supposing it to be the 'walker' but, hearing it again, I looked and saw a gun barrel between the folding doors on the side next to dry kiln No. 3, and immediately I saw a man's hand on the gun barrel; then the door flew open, and Mitchell, the defendant, stepped in, advancing toward where the boy and I were sitting. I said, 'Mitchell, what is the matter with you?' He continued towards us with the gun in a shooting position. I asked him this question two or three times. I got up, and as he was coming he said, '—— ——, I told you I was going to get you!' My talk with the defendant awoke the boy, and we both ran towards the south door of the room. Murphy was to my left as we ran, and just before we reached the door a gun fired. The force of the load knocked Murphy down, and he fell in front of me, striking the double doors as he fell, and I saw a hole in the back of his coat. The defendant was so close to us when the gun fired that the powder burned my hand."

Appellant, testifying in his own behalf, stated that on the night of the killing deceased robbed him of $12.25 in money at his (appellant's) home by placing a razor at his throat and forcing him to deliver the money. He detailed the circumstances of the killing as follows:

"About ten minutes after he left, I got up and went over to Willis Cole's house and told him about Murphy robbing and threatening to kill me. I took Cole's gun, and went to look for him. I found him at No. 4 dry kiln about 3:30 A. M. I pulled the door open a little, looked in, and Booker asked me what I wanted. I then pulled the door wide open, walked in, and Booker again asked me what I wanted. About this time deceased got up out of his chair and started toward me with a razor. Then he saw the gun I had, and whirled to run out of the dry kiln, when I shot him. Booker ran out too. Deceased got behind the door of the dry kiln, and when I went out to look for him started toward me again, and still had the razor. I threw up the gun, and he whirled; then I shot him. I did not see the deceased again, and did not know whether I had killed him or not. I would not have shot him if he had not started on me with a razor. He said he would kill me, and I ran over to Mr. Glass' house."

Error of the court is assigned in permitting witness Mc-Murrough, in his testimony concerning the dying declaration of Murphy, to relate statements said to have been made by deceased in addition to those set forth in a written memorandum. The witness testified that he was a justice of the peace, and administered an oath to deceased; that deceased made a statement to him of the circumstances of the shooting, and that he (witness) reduced the statement to writing as fully as he could, but did not take down all that deceased said in reference to the shooting, though the writing was correct as far as it went. The writing was not signed by deceased, but was read to the jury without objection. It was not necessary to read to the jury the notes or memoranda made by the witness, but it was not improper to do so where they were verified as correct by the sworn testimony of the witness. *Petty* v. *State,* 76 Ark. 515. In this respect evidence of a dying declaration is like evidence of what an absent witness testified to at a former trial. The writing is not, how-

ever, conclusive as to what the declarant had said.

"Where an auditor of a dying declaration makes in written form a note or report of the oral utterances, this written statement of the auditor is not preferred evidence, and need not be produced; for there is not and never was any principle of evidence preferring a person's written memorandum of testimony to his or another's oral or recollection testimony. Nor is the case different when the person thus making the written report was a magistrate having the power to administer oaths or take testimony on a preliminary examination; for such a person has no duty or authority by law to report dying declarations, and it would be solely by virtue of an expressed duty that a magistrate's report could be preferred to other witnesses." 2 Wigmore on Evidence, § 1450. There can be no difference, in principle, where the auditor testified that for reasons given the written memorandum did not contain the full statement of the declarant. In such cases the witness could read the memorandum, as far as it goes, and supply from his own recollection the remainder of the declarant's statement. No error is found in the ruling of the court on the question.

Error of the court is also assigned in refusing to admit testimony of a statement alleged to have been made by appellant to another person a few moments after the killing. It is not shown what appellant said to the witness, as no offer was made to prove any particular fact. The witness was merely asked to state what appellant said to him, and the court excluded the question. It is therefore impossible for us to say whether or not the excluded question and answer related to any material matter. At any rate, the testimony was not competent as a part of the *res gestae.* It does not appear from the evidence precisely what time had elapsed since the killing when the statement was made, nor the distance appellant had gone from the scene of the killing when he made the statement to the witness. The latter merely said that he was awakened at his home by Booker, and that appellant came up immediately, and made a statement to him. This is not sufficient to render a self-serving statement of appellant competent as evidence in his own favor. *Little Rock Trac. & Elec. Co.* v. *Nelson,* 66 Ark. 494; *Blair* v. *State,* 69 Ark. 558.

Appellant requested the court to give the following two instructions, the first of which (number 3) the court gave, and the other was refused:

"3. The jury is instructed that if they believe from the evidence that the defendant had been· assaulted and robbed by the deceased, he had the right to pursue and apprehend the deceased and in so doing the deceased turned upon the defendant with a razor, and the defendant, acting as a reasonably prudent man, thought that deceased was about to cut him, and that the danger to him was apparently urgent, imminent and pressing, then you are instructed that the defendant, under the law, acting as a reasonable and prudent person, had the right to defend himself, and, if necessary, to shoot the deceased.

"4. If you believe from the evidence that the deceased had robbed the defendant, then you are told that the defendant had a right to pursue and arrest the deceased, and if deceased resisted arrest, or fled so that he could not be apprehended alive, then you are told that the defendant would be justified in slaying him."

These two instructions are based upon entirely different and inconsistent theories of defense—one upon the theory of self-defense and the other upon the right of a citizen who is attempting to arrest one guilty of a felony to slay him in order to prevent his escape. There is some evidence tending to sustain the former theory, as appellant testified that when he fired the gun deceased was trying to cut him with a razor. But there is no testimony tending to establish the other theory. Appellant does not say that he shot deceased in order to prevent his escape, but does say that he shot him in his own defense. This was submitted to the jury upon instruction number three prepared by appellant's counsel, and the jury rejected appellant's statement of the facts as untrue. His statements were in direct conflict with the testimony of Booker and the dying declarations of Murphy which made out a clear case of murder in the first degree. Appellant can not complain of the refusal of the court to submit to the jury a theory which neither his own statement of the facts nor the statements of other witnesses tended to sustain.

We are of the opinion that no error was committed by the

court, and that the verdict of the jury is well sustained by the evidence.

Affirmed.